TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JENNIFER CHOU (Cal. Bar No. 238142)
SARA MILSTEIN (Cal. Bar No. 313370)
Assistant United States Attorneys
Violent & Organized Crime Section
        1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-6482/8611
        Facsimile: (213) 894-3713
        Email:     jennifer.chou@usdoj.gov
                   sara.milstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 19-00055-MWF-11 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION AND OBJECTIONS TO PRESENTENCING REPORT AS TO DEFENDANT JOSE MANUEL GALLO; EXHIBITS FILED SEPARATELY UNDER SEAL |
| v. | |
| JOSE MANUEL GALLO, | |
| Defendant. | Hearing Date: 11-8-2021 Hearing Time: 2:00 p.m. |

        Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Jennifer Chou and

Sara Milstein, hereby files its sentencing position and objections to

the presentence report in the above-captioned case as to defendant

JOSE MANUEL GALLO.

//

//

//

This sentencing position is based upon the attached memorandum of points and authorities, the exhibits filed separately under seal, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 29, 2021        Respectfully submitted,

                                TRACY L. WILKISON
                                Acting United States Attorney

                                SCOTT M. GARRINGER
                                Assistant United States Attorney
                                Chief, Criminal Division


                                      /s/
                                _____
                                JENNIFER CHOU
                                SARA MILSTEIN
                                Assistant United States Attorneys

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES..................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION...................................................1

II.   CRIMINAL HISTORY AND GUIDELINES................................5

      A.   Defendant's State ADW Conviction Should Be Assigned
           Three Criminal History Points, Resulting in Criminal
           History Category IV.......................................5

      B.   Base Offense Level for Conspiracy to Commit Murder........6

      C.   Defendant has Arguably Breached the Plea Agreement........6

III.  ANALYSIS OF THE SECTION 3553(A) FACTORS........................8

      A.   18 U.S.C. § 3553(a)(1)....................................9

      B.   18 U.S.C. § 3553(a)(2)...................................14

      C.   18 U.S.C. § 3553(a)(6)...................................14

      D.   THE REMAINING 3553(a) FACTORS ALSO SUPPORT THE
           SENTENCE REQUESTED BY THE GOVERNMENT.....................16

IV.   THE SUSPICIONLESS SEARCH CONDITIONS TO WHICH DEFENDANT HAS
      AGREED ARE APPROPRIATE AND SHOULD BE IMPOSED..................16

V.    VICTIM RIGHTS AND RESTITUTION.................................20

VI.   CONCLUSION...................................................20

# TABLE OF AUTHORITIES

DESCRIPTION                                                                    PAGE

**FEDERAL CASES**

Samson v. California,
        547 U.S. 843 (2006)...................................17, 18, 19

United States v. Betts,
        511 F.3d 872 (9th Cir. 2007).........................17, 18, 19

United States v. Cimino,
        381 F.3d 124 (2d Cir. 2004)..................................8

United States v. DeWitt,
        366 F.3d 667 (8th Cir. 2004).................................7

United States v. Edgell,
        914 F.3d 281 (4th Cir. 2019).................................7

United States v. Franklin,
        701 F. App'x 575 (9th Cir. 2017).............................6

United States v. Khan,
        474 F. App'x 538 (9th Cir. 2012).............................7

United States v. Lara,
        690 F.3d 1079 (8th Cir. 2012)................................7

United States v. Lo,
        839 F.3d 777 (9th Cir. 2016)..............................6, 7

United States v. Manzo,
        657 F.3d 1204 (9th Cir. 2012)................................7

United States v. Partida-Parra,
        859 F.2d 629 (9th Cir. 1988).................................8

United States v. Saeteurn,
        504 F.3d 1175 (9th Cir. 2007)...............................15

United States v. Tafelmeyer,
        584 F. App'x 766 (9th Cir. 2014)............................17

**FEDERAL STATUTES**

18 U.S.C. § 3553(a).......................................9, 14, 16

21 U.S.C. § 846...................................................1

21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)...........................1

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

**UNITED STATES SENTENCING GUIDELINES**

USSG § 2A1.5.................................................2, 6

USSG § 2E1.1.................................................2, 6

USSG § 3D1.4...................................................2

USSG § 3E1.1...................................................2

USSG § 4A1.2...................................................5

USSG § 5D1.3(d)(7)(C).........................................17

USSG § 5K2.23................................................4, 8

USSG § D1.1,...................................................2

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3       Defendant JOSE MANUEL GALLO, also known as "Rooster"

4  ("defendant"), pleaded guilty on August 18, 2021, pursuant to a plea

5  agreement, to Counts One and Seven of the First Superseding

6  Indictment ("FSI") in United States v. MARIO ALBERTO MIRANDA, et

7  al., CR No. 19-00055(B)-MWF-11.  Those counts charge defendant with

8  Racketeer Influenced and Corrupt Organizations ("RICO") Conspiracy,

9  in violation of 18 U.S.C. § 1962(d), and Conspiracy to Possess with

10 Intent to Distribute and Distribute Controlled Substances, in

11 violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii),

12 respectively.

13      On October 4, 2021, the United States Probation Office

14 disclosed the Presentence Report ("PSR") (CR 1145).  The government

15 concurs with the PSR's calculation of the base offense level of the

16 United States Sentencing Guidelines, Nov. 1, 2018 ed. ("USSG" or

17 "Sentencing Guidelines"), which tracks the stipulated Guidelines

18 base offense level set forth in paragraph 20 of the Plea Agreement.[1]

19 PSR ¶¶ 64-92.

20 //

21 //

22 //

23

24

25

26

27      [1] As discussed further below, defendant is prohibited by the
    terms of the plea agreement from arguing that the base offense level
    of the Murder Conspiracy Pseudo-Count is less than 33, and his
28  attempt to argue that the Court should apply a base offense level of
    27 is arguably in breach of the plea agreement.  See Def. Br. at 13.

RICO Pseudo-Count 1

| | | | |
|---|---|---|---|
| Conspiracy to Commit Murder | : | 33 | [USSG §§ 2E1.1(a)(2), 2A1.5(a)] |

RICO Pseudo-Count 2

| | | | |
|---|---|---|---|
| Drug Trafficking | : | 30[2] | [USSG § 2E1.1(a)(2), 2D1.1(c)(5)] |

| | | | |
|---|---|---|---|
| Highest Group Offense Level: Pseudo-Count 1 | : | 33 | |
| Multi-Group Adjustment | : | +2 | [USSG § 3D1.4] |
| Early Acceptance of Responsibility | : | -3 | [USSG §§ 3E1.1(a), (b)] |
| Total Offense Level | : | 32 | |

However, the government disputes the PSR's determination that defendant falls within Criminal History Category III with only four[3] criminal history points.  PSR ¶¶ 101-02.  Here, the PSR incorrectly assigned zero criminal history points to defendant's five-year prison sentence imposed on June 28, 2018, arising from defendant's assault with a deadly weapon on December 3, 2017 (the "state ADW").  PSR ¶ 100.  Instead, the Court should find that this conviction was sustained prior to the last overt act of the RICO conspiracy, a conspiracy that defendant has admitted continued until November 21, 2019.  In doing so, the Court would apply an approach and reading of Application Note 4 to USSG § 3E1.1 that is consistent with the way

---

[2] According to the Guidelines conversion table, 54.7 grams of actual methamphetamine, 3.22 grams of a mixture and substance containing a detectable amount of methamphetamine, and 24.7 grams of heroin is the equivalent of 1,125 kilograms of marijuana.  1,125 kilograms of marijuana is between 1,000 and 3,000 kilograms of marijuana, which results in a Base Offense Level of 30.

[3] Paragraph 101 of the PSR states that defendant has a total of five criminal history points, which appears to be a typographical error, as the preceding paragraphs in the PSR describe convictions that are assigned a total of four points.  See PSR ¶ 97 (3 points) and ¶ 99 (1 point).

it has already calculated the criminal history categories for similar RICO co-defendants already sentenced in this case, namely, defendants Ignacio Contreras, Anthony Carlos Avila, Jose Luis Banda, and David Vasquez.

Accordingly, the Court should find that defendant has 7 criminal history points, which results in Criminal History Category IV.  With a total offense level of 32, the resulting advisory Guidelines range as to Counts One and Seven is 168-210 months, with a 10-year mandatory minimum sentence.

Assuming that the government does not move the Court to declare that defendant breached the plea agreement and that the government is bound to its obligations set forth in the plea agreement, the government has agreed to limit its sentencing recommendation to the high end of the applicable Guidelines range, provided the total offense level is 32 or higher.

The government has also agreed in the plea agreement not to oppose defendant's request that the Court decrease the federal sentence by the amount of time defendant served for the state ADW, so long as the final adjusted sentence is not below the statutory mandatory minimum sentence of 10 years.  According to California prison records, defendant was in custody for the state ADW from his arrest on December 3, 2017, to his parole on May 8, 2021, which results in a total period of 3 years, 6 months, and 5 days, or very slightly over 42 months.[4]

_____

[4] The recommendation letter from the United States Probation Office dated September 27, 2021 (the "PSR letter"), states that defendant was in custody for the state ADW case for approximately 35 months, suggesting that he was not incarcerated for the seven-month period between his arrest on December 3, 2017, and when he was

*(footnote cont'd on next page)*

3

Because defendant has finished serving the custodial sentence for the state ADW conviction, the applicable discretionary departure Guideline is USSG § 5K2.23.  The PSR letter recommends that this Court apply § 5K2.23 and subtract the period defendant spent in state custody for the state ADW from the low end of the Guidelines calculated in the PSR, which is based on Criminal History Category III, rather than IV.

Accordingly, the Court should find that defendant has seven criminal history points and is Criminal History Category IV, with a resulting Guidelines range of 168-210 months.  Adjusting for the 42 months defendant spent in custody for the state ADW sentence, the adjusted Guidelines range is 126-168 months, with a statutory mandatory minimum sentence of 120 months.

Therefore, the government recommends that the Court impose the following sentence:  150 months' imprisonment, followed by a five-year period of supervised release with the terms and conditions recommended in the PSR Letter, except that condition #8 in the letter be replaced with the conditions regarding suspicionless search to which defendant stipulated at paragraph 2(c)(i) in the plea agreement; and a mandatory special assessment of $200.  The government defers to the PSR's determination that defendant does not have the ability to pay a fine and does not object to a waiver of the fine.  PSR ¶¶ 142-47; PSR Letter at 1, 7.

---

convicted and sentenced on June 28, 2018.  To the government's knowledge, defendant was detained for that entire period, which makes the total detention period about 42 months.

4

## II.   CRIMINAL HISTORY AND GUIDELINES

### A.   Defendant's State ADW Conviction Should Be Assigned Three Criminal History Points, Resulting in Criminal History Category IV

The PSR incorrectly assigns zero points to defendant's state ADW conviction.  PSR ¶ 100.  The PSR notes that the "conduct underlying this state conviction is relevant conduct to the instant federal offense."  Id.

However, this Court has found on several prior occasions when sentencing co-defendants in this case with the same criminal history calculation issue that a conviction arising from an incident that is relevant conduct to the instant federal RICO offense is, under Application Note 4 to USSG § 2E1.1, exempt from the general rule of USSG § 4A1.2(a) that no criminal history points should be assigned to a sentence that defendant sustained for conduct that is "part of the instant offense."  Instead, where defendant has been convicted of RICO Conspiracy, any prior sentences arising from conduct alleged as overt acts in the RICO conspiracy are to be assessed criminal history points.[5]  At the sentencings of the co-defendants noted above, this Court agreed that criminal history points should be assessed to state convictions for crimes that are part of or relevant to the RICO offense, as long as the convictions were sustained prior to the last overt act of the RICO conspiracy.

Here, as in the case with the similar co-defendants, this defendant has stipulated that the RICO conspiracy continued to November 21, 2019.  Plea Agreement ¶ 18(e).  Therefore, his

---

[5] The government incorporates by reference the legal arguments included in its sentencing papers submitted as to co-defendant Banda, docketed in this case at CR 902, 912, and 913.

conviction for the state ADW on June 28, 2018, occurred prior to the last overt act of the RICO conspiracy and, pursuant to Application Note 4 to § 2E1.1, must be assessed three criminal history points. Accordingly, defendant has 7 criminal history points and is in Criminal History Category IV.

**B.   Base Offense Level for Conspiracy to Commit Murder**

Defendant plainly stipulated to a base offense level of 33 for the RICO pseudo-count relating to conspiracy to commit murder in the plea agreement, which specifically cites the corresponding Guideline at USSG §§ 2E1.1(a)(2), 2A1.5(a).  Plea Agreement ¶ 20.  The stipulated base offense level excludes any citation to USSG § 2A1.5(c)(2) and its cross-reference to USSG § 2A2.1, which provides a base offense level of 27 for Assault with Intent to Commit Murder or Attempted Murder.  There is no ambiguity in this stipulation; the parties' have agreed that this pseudo-count carries a base offense level of 33 for conspiracy to commit murder, not 27 for a different crime.  See United States v. Lo, 839 F.3d 777, 783 (9th Cir. 2016) (courts generally enforce plain language of plea agreement that is clear and unambiguous on its face).

**C.   Defendant has Arguably Breached the Plea Agreement**

Were the situation reversed and the government argued in its sentencing paper for a higher base offense level than that stipulated in the plea agreement, there is no question doing so would constitute a breach of the plea agreement by the government.  See, e.g., United States v. Franklin, 701 F. App'x 575, 577 (9th Cir. 2017) (government breached obligation in plea agreement to stipulate to base offense level of 24 by stating in sentencing position that base offense level of 26 calculated in presentence report was "technically accurate");

1  United States v. Khan, 474 F. App'x 538, 538 (9th Cir. 2012)

2  (government breached plea agreement "by failing to recommend at

3  sentencing the base offense level to which the parties stipulated in

4  the plea agreement); United States v. Edgell, 914 F.3d 281, 288 (4th

5  Cir. 2019) (government breached plea agreement by "requesting a

6  sentence inconsistent with the stipulation"); United States v. Lara,

7  690 F.3d 1079, 1083 (8th Cir. 2012) (same); United States v. DeWitt,

8  366 F.3d 667, 671 (8th Cir. 2004) (same) ("Where the government

9  stipulates to a drug quantity and a base offense level, it may not

10 then initiate an effort at the sentencing hearing to obtain a greater

11 sentence" based on a higher base offense level).

12      By the same logic, defendant's recommendation of a Guidelines

13 level other than the stipulated level and his failure to recommend

14 that the Court adopt the base offense level of 33 to which he

15 stipulated in the plea agreement constitute a breach.  Defendant's

16 attempt to circumvent his obligation to recommend the stipulated base

17 offense level of 33 by attempting to direct the Court to a completely

18 different Guideline provision was neither contemplated by the parties

19 nor allowable under the plain language of the plea agreement.  See

20 Lo, 839 F.3d at 783.  Such a breach denies the government the

21 "benefit of their bargain."  Khan, 474 F. App'x at 539.  As the Ninth

22 Circuit held in Khan, "sustaining the breach would impair the

23 integrity and reputation of judicial proceedings" so remand for

24 resentencing and order gov's specific performance of the plea

25 agreement.  Id. (citing United States v. Manzo, 657 F.3d 1204, 1211-

26 13 (9th Cir. 2012).

27      "[W]here the defendant breaches the plea bargain, courts have

28 found the government to be free from its obligations under the plea

agreement."  <u>United States v. Partida-Parra</u>, 859 F.2d 629, 633 (9th Cir. 1988) (citations omitted); <u>see also</u> <u>United States v. Cimino</u>, 381 F.3d 124, 127-28 (2d Cir. 2004) ("when a defendant breaches his plea agreement, the Government has the option to either seek specific performance of the agreement or treat it as unenforceable").  Here, should the Court declare that defendant has breached this plea agreement, then the government reserves the right at sentencing to seek a sentence that is higher than the high end of the applicable Guidelines range (168-210 months) and to oppose defendant's request that the Court reduce his federal sentence by 42 months under USSG § 5K2.23 based on the amount of time he served in state custody for the state ADW conviction.  Alternatively, should the Court declare a breach, the government reserves the right to move for specific performance of the plea agreement, such that defendant recommends the Court adopt the base offense level of 33 for the conspiracy to commit murder pseudo-count as stipulated in the plea agreement.

## III. ANALYSIS OF THE SECTION 3553(A) FACTORS

The stipulated factual basis supports the agreed-upon Guideline for conspiracy to commit murder, because defendant did, as he has admitted in the plea agreement, enter into an agreement with fellow Vineland Boys gang members that someone in the enterprise would commit murder in furtherance of the gang.  Defendant's repeated acts of violence involving dangerous weapons, including firearms, is evidence of his participation in this conspiracy, and justifies the government's request for a sentence of 150 months.  Further, defendant's requested sentence of 120 months — the mandatory minimum sentence triggered by the amount of drugs sold by defendant in the course of the RICO and drug conspiracies — fails to account for any

of these violent acts, effectively zeroing out the sentences for non-drug conduct as if such conduct had never occurred.  The victims of these acts of violence deserve further vindication.

The government submits that the factors set forth at 18 U.S.C. § 3553(a) would be fulfilled by a custodial sentence of 150 months, which falls within the applicable Guidelines range adjusted for credit for time served by defendant in his state ADW case.

## A.   18 U.S.C. § 3553(a)(1)

Section 3553(a)(1) requires the Court to consider the nature and circumstances of the offense, as well as the history and characteristics of defendant.

Here, defendant sold and offered to sell heroin and methamphetamine on multiple occasions.  PSR ¶¶ 50-51, 53, 57.  He possessed, sold, and offered to sell firearms.  PSR ¶¶ 49, 51, 54, 57, 60.  Most significantly, defendant engaged in several extreme acts of violence in furtherance of the Vineland Boys gang that exemplify why gang violence poses such a danger and constant source of terror to their victims and surrounding communities.

First, defendant admitted that he drove with other VBS members, including co-defendant Jesus Gonzalez Jr., to the area of South Walton Avenue and 38th Street in Los Angeles to confront, attack, and retaliate against members of a rival gang who defendant suspected of having killed a VBS member.  PSR ¶ 52; Plea Agreement ¶ 18(g)(iv).  A report summarizing Gonzalez's recounting of the shooting following day to an FBI confidential informant ("CHS-1") is attached, under seal, as Exhibit A; a draft transcript of the recorded conversation between Gonzalez and CHS-1 is attached, under seal, as Exhibit B.  As set forth in Exhibits A and B, on December 6, 2015,

defendant and other VBS members were attending the funeral of a deceased VBS member, along with members from another gang called the Stone Villains.  One Stone Villains member claimed that the deceased VBS member had been killed by members of the ATC gang, and defendant and other VBS and Stone Villains members agreed to drive from the funeral to the ATC gang's neighborhood, near Walton Avenue and 38th Street, to retaliate against the ATC members.  As Gonzalez explained to CHS-1:

> I told Gallo: "Let's do it like we do it in the hood, fool."  Like, we know what's right, we fuck up and we get the green light[.]

Ex. B at 28 (VBS_1D_000431).  In other words, by targeting the ATC gang with a "green light," defendant and the other VBS members drove to the ATC neighborhood with the intent to shoot and kill ATC members.  Defendant exchanged gunfire with residents in the neighborhood, then crashed his car into another car and fled the scene.  See Ex. A.  The government's recommended sentence is justified by defendant's flagrant and reckless disregard for the safety of the residents of that neighborhood, as well as the harm he inflicted upon the residents and their property.  Shortly after the shooting, defendant filed a false police report claiming that his car had been stolen while he was at the funeral in order to avoid being linked to the shooting.  Filing a false report is a violation of California Penal Code Section 148.5, and it caused the Los Angeles Police Department to expend additional resources to investigate the false report even as police were investigating the ATC shooting.  The government's recommended sentence takes into account defendant's uncharged false report crime and manipulation of law enforcement to hide his own criminal behavior.

1    Defendant also admitted that he stabbed a rival gang member in

2    the face and neck during a confrontation in an alley in VBS territory

3    in which defendant was shot in the face.  PSR ¶ 58; Plea Agreement

4    ¶ 18(g)(x).  While defendant emphasizes his own injuries, see Def.

5    Br. 7, the victim also suffered severe injuries as a result of

6    defendant's actions.  Exhibits C and D, filed under seal, are reports

7    summarizing the victim's medical records relating to this incident.

8    As set forth in these reports, the victim arrived at the hospital

9    soaked in blood and was hospitalized for several days as a result of

10    being stabbed in the neck and also suffering knife cuts to his hands.

11    Ex. C.  These lacerations appear to be defensive wounds sustained

12    when the victim put up his hands to protect himself from defendant's

13    knife, suggesting that defendant repeatedly stabbed the victim

14    numerous times.  The victim was intubated, suffered a large amount of

15    blood loss and required a blood transfusion.  See Ex. D.

16    A month later, on January 3, 2017, defendant recounted the

17    incident to CHS-1.  An excerpt from the draft transcript of

18    defendant's recorded conversation with CHS-1 is attached, under seal,

19    at Exhibit E.  Defendant explained that he did not know whether he

20    stabbed his victim or whether he was shot first.  He did say he

21    recalled stabbing the other person, and he described advancing on the

22    person willingly, suggesting he was not only acting in self-defense.

23    Ex. E at 3 (VBS_1D_001274).

24    Moreover, the nature of the victim's wounds – beyond the

25    extreme, life-saving medical intervention he required – is

26    instructive.  The victim had knife cuts on his hands and forearms,

27    suggesting that defendant attempted to stab the victim multiple

28    times, and the victim defended himself multiple times before

1   defendant was able to strike his near-fatal stab wounds to the

2   victim's neck.  See Ex. D.  The extent of the victim's defensive

3   wounds suggest that defendant continually stabbed and attempted to

4   stab the victim.  Those are not the actions of someone acting in

5   self-defense.

6     Defendant also told CHS-1 that he intended to retaliate against

7   the rival gang member and the rival's associate, as well as anyone

8   who tried to stop defendant.  PSR ¶ 58.  In defendant's own words, he

9   said: "Fool, you know how bad I want to go fucking smoke this nigger

10   already, fool?  Both of these fools, huh?  And whoever comes in the

11   way I'm gonna smoke them too.  Straight up."  Ex. E at 5

12   (VBS_1D_001276).  These statements cannot be considered idle threats,

13   as they came from an individual with an extensive history of violence

14   and use of deadly weapons.

15     Defendant's injuries did not deter him from continuing to

16   participate in VBS gang activities, including attending and speaking

17   at a VBS gang meeting a month after the incident.  PSR ¶ 59; Plea

18   Agreement ¶ 18(g)(xi).  An excerpt of the draft transcript of the

19   recorded gang meeting of January 22, 2017, is attached, under seal,

20   at Exhibit F.  During this meeting the gang's shot-caller, co-

21   defendant Mario Miranda, ordered the members to obtain firearms and

22   engage in retaliatory acts of violence in response to defendant's

23   incident:

24         The older homies are tripping, there ain't nobody doing
           shit out here fool.  That there ain't nobody putting in

25         work, the homie Gallo just got shot, Glow just got shot
           five days ago.  Ain't no type of retaliation going on yet

26         though.  I'm not saying nobody is going to get
           [*unintelligible*].  We just got to put a little more effort

27         into that shit [*unintelligible*] . . . . Nobody has a
           strap . . . . It shouldn't be that way dog.  Everybody

28

1       should have a fucking gun dog.  Everyone should have their
2       own personal gun homie.  Straight up.

3  Ex. F at 4-5 (VBS_1D_001379-80).

4       Whatever physical or mental trauma defendant incurred from the
5  stabbing incident also failed to deter him from committing more acts
6  of violence, such as the state ADW.  On December 3, 2017, defendant
7  approached victim A.G. as the victim was working on his vehicle in a
8  parking lot in Vineland Boys territory, pointed a loaded gun at the
9  victim, and asked, "Where are you from, I'm from Vineland" — a clear
10 gang-related threat.  PSR ¶ 60; Plea Agreement ¶ 18(g)(xii).  Victim
11 A.G. ran away, and defendant then did the same thing to victim M.G.
12 Id.  Defendant terrorized these innocent victims at gunpoint simply
13 because he felt empowered by the Vineland Boys gang to engage in acts
14 of violence, all in furtherance of the enterprise's agreement and
15 conspiracy to commit murder.  For this crime, defendant served about
16 42 months in state custody.

17      Defendant's personal circumstances do not provide sufficiently
18 mitigating grounds to justify a below-Guidelines sentence.  While he
19 has certainly suffered from substance abuse problems, he had a fairly
20 stable upbringing and a loving family.  The report of defendant's
21 examination by his medical expert confirms that he does not suffer
22 from depression, post-traumatic stress disorder, or other mental
23 health issues.  See Def. Ex. 4-5.  Defendant should be held
24 accountable for his choices to be active in the Vineland Boys gang,
25 to engage in armed violent encounters, and to sell drugs and
26 firearms.

27      Defendant's conduct, his extreme violent behavior, and the harm
28 and terror he has wrought upon the public and his victims justify a

sentence of 150 months.  Defendant's criminal conduct and criminal history are taken into account in the Guidelines when calculated properly under the government's approach.

**B.    18 U.S.C. § 3553(a)(2)**

Section 3553(a)(2) requires the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from future crimes of defendant, and to provide defendant with any needed training and guidance.  These factors also support a sentence of 150 months.  Not only are his acts of violence serious crimes, but also defendant has shown little respect for the law.  Defendant's prior criminal acts resulted in incarceration and dangerous situations like crashing his car and being shot in the face, but none of those consequences deterred his continued criminal activity.  The government's recommended sentence, even when reduced by credit for time served in the state case, should have a significant deterrent effect, but more importantly, the sentence will also protect the public, especially given defendant's active engagement in gang-related violence.  During defendant's period of incarceration, defendant can continue to take advantage of training, drug treatment, and other enrichment programs, and supervised release can provide him with resources to assist in his re-entry after completing his prison term.  The sentence may also serve as a general deterrent to other potential offenders.

**C.    18 U.S.C. § 3553(a)(6)**

18 U.S.C. § 3553(a)(6) requires the Court to minimize sentencing disparity among similarly-situated defendants.  Using the Sentencing

14

Guidelines to sentence defendant accomplishes this goal.  Similarly-situated defendants with the same criminal history would likely receive a sentence within the same range.  See United States v. Saeteurn, 504 F.3d 1175, 1181 (9th Cir. 2007) ("Our sister circuits generally agree that 'Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case.'") (citations omitted).  Here, the recommended sentence falls within the adjusted Guidelines.  A similarly-situated defendant would be subject to the same sentencing range.

While this factor requires the Court to compare defendant to similarly-situated defendants across the nation, it is also instructive for this Court to compare defendant to the co-defendants in this case who have already been sentenced.  Defendant argues that defendant should not be given a more severe sentence than co-defendant Anthony Avila, who was sentenced to 168 months in prison, with credit for time served on an undischarged term of imprisonment in a state case.  Def. Br. 10-12.

Defendant's comparison to co-defendant Avila is inapt.  First, co-defendant Avila was not charged or convicted of the drug trafficking conspiracy.  Second, defendant's violent conduct is arguably more serious than co-defendant Avila's, as defendant repeatedly engaged in acts of violence on behalf of the gang, including conspiring to commit murder.  Insofar as defendant has admitted to participating in a murder conspiracy, he has admitted to conduct more serious than the conduct to which co-defendant Avila admitted.  Simply because defendant is listed in the indictment as defendant number 8 and co-defendant Avila as defendant number 11 is

15

not good cause for this Court to believe defendant's conduct is any less egregious than the stipulated facts demonstrate.

### D. THE REMAINING 3553(a) FACTORS ALSO SUPPORT THE SENTENCE REQUESTED BY THE GOVERNMENT

18 U.S.C. § 3553(a)(3) requires the Court to consider the kinds of sentences available. A 150-month period of imprisonment, followed by a five-year period of supervised release, is a fair sentence, given the scope of potential harm of defendant's offense, and provides punishment that is sufficient but not greater than necessary to address the offense.

18 U.S.C. § 3553(a)(4) & (5) now merely require the Court to take the sentencing Guidelines as "advisory."

### IV. THE SUSPICIONLESS SEARCH CONDITIONS TO WHICH DEFENDANT HAS AGREED ARE APPROPRIATE AND SHOULD BE IMPOSED

Defendant has stipulated to two conditions of supervised release related to suspicionless search:

> i.  Defendant shall submit defendant's person and any property under defendant's control, including any residence, vehicle, papers, computer and other electronic communication or data storage devices and media, and effects, to suspicionless search and seizure at any time of the day or night by any law enforcement or probation officer, with or without a warrant, and with or without cause; and
>
> If stopped or questioned by a law enforcement officer for any reason, defendant shall notify that officer that defendant is on federal supervised release and subject to search.

Plea Agreement ¶ 2(c).

Despite the stipulation, the PSR Letter does not recommend that the conditions be imposed. Instead, the Recommendation Letter recommends a condition allowing a search only upon reasonable suspicion and conducted at a reasonable time. PSR Letter at 3. The

16

Court should impose the two stipulated conditions because they are appropriate, just, and are the product of the parties' negotiated agreement.

Suspicionless search conditions both protect the public and deter recidivism, as offenders know that the chance of detection of any criminal conduct is greater.  The Ninth Circuit has upheld the imposition of suspicionless search conditions of supervised release. See United States v. Betts, 511 F.3d 872, 876 (9th Cir. 2007) (affirming suspicionless search condition in part because "the public is entitled to protection against the possibility" of recidivism); United States v. Tafelmeyer, 584 F. App'x 766, 767 (9th Cir. 2014) ("The district court did not abuse its discretion in imposing [a suspicionless search] condition of release because the condition reasonably furthers the goals of deterrence, protection of the public, and rehabilitation of the offender.") (citations and quotations omitted).

The Supreme Court has similarly upheld suspicionless search conditions on all parolees in California:

> California's ability to conduct suspicionless searches of parolees serves its interest in reducing recidivism, in a manner that aids, rather than hinders, the reintegration of parolees into productive society.

Samson v. California, 547 U.S. 843, 854 (2006).

Although the advisory Sentencing Guidelines recommend that search conditions require reasonable suspicion, see USSG § 5D1.3(d)(7)(C), imposition of such conditions is both better policy and better practice, especially for this defendant.  First, as both the Ninth Circuit and Supreme Court have held, it is the risk that those on supervision could be searched at any time, for any or no

17

reason, that deters those offenders from possessing contraband or engaging in new criminal conduct, and therefore promotes rehabilitation and public safety.  Conditioning searches upon a showing of reasonable suspicion makes them less likely and therefore less effective.  Indeed, Samson rejected the argument that reasonable suspicion should be required before an officer could make use of a search condition, and criticized such restrictions for undercutting the safety and deterrence benefits suspicionless search conditions create, as the Ninth Circuit also recognized that "'[i]mposing a reasonable suspicion requirement . . . would give parolees greater opportunity to anticipate searches and conceal criminality.'"  Betts, 511 F.3d at 876 (quoting Samson).

Additionally, a search condition that requires reasonable suspicion will result in confusion because it is contrary to California's search condition scheme, and the overwhelming majority of law enforcement officers in our district has been trained in the state scheme.  By state statute, all parolees are subject to "search or seizure by a probation or parole officer or other peace officer at any time of the day or night, with or without a search warrant or with or without cause."  Cal. Penal Code § 3067(b)(3) (emphasis added).  There are well over 100,000 California released parolees subject to this condition.  Samson at 853 ("As of November 30, 2005, California had over 130,000 released parolees.").  Given the uniformity of California's suspicionless search scheme, and the overwhelmingly larger numbers of state officers and state parolees, search conditions for federal and state supervisees should be consistent.

1      In order to make the proposed search condition effective, law

2 enforcement officers must know that defendant is subject to search.

3 Accordingly, the government asks the Court to impose this second

4 condition, requiring defendant to notify any law enforcement officer

5 that he is on federal supervised release and subject to search.

6      A condition allowing for suspicionless searches is particularly

7 important for this defendant, given his history of possession and

8 trafficking of drugs and firearms, as well as of other contraband,

9 such as the stolen or fraudulent checks, debit cards, vehicle

10 registration documents, identification card, and stolen mail that he

11 possessed in the course of this investigation.  PSR ¶ 55.  Indeed,

12 the case for imposing a suspicionless search condition on defendant

13 is much stronger than it was in other cases in which those conditions

14 have been affirmed by the Supreme Court or Ninth Circuit.  See

15 Samson, 547 U.S. 843 (affirming blanket suspicionless search

16 condition on all California parolees;, Betts, 511 F.3d 872 (affirming

17 suspicionless search condition on first-time offender whose crime —

18 taking bribes to delete negative credit information from Transunion's

19 database — would be difficult to detect by search).

20      The government hopes that the suspicionless search conditions

21 will have the desired deterrent effect, particularly because

22 defendant has lived the consequences of non-compliance.  Moreover,

23 knowing he is subject to suspicionless search at any time of day or

24 night should act as a more effective deterrent than the proposed

25 condition, which requires reasonable suspicion — that is, a condition

26 that makes no distinction between him and someone who does not have a

27 proven history of possessing and selling contraband.

28

**V.   VICTIM RIGHTS AND RESTITUTION**

As of the time of this filing, none of the victims of the offenses have requested restitution or provided statements to submit to the Court.  The government will provide such requests or statements if made by victims prior to the sentencing hearing.

**VI.   CONCLUSION**

For the foregoing reasons, the Court should find that defendant has 7 criminal history points and is Criminal History Category IV, that the total offense level is 32, and that the applicable Guidelines range for Counts One and Seven is 168-210 months.  Should the Court reduce the federal sentence by 42 months to account for the time defendant served in the state ADW, then the adjusted Guidelines range for Counts One and Seven is 126-168 months.  The Court should impose a mid-range sentence of 150 months, followed by a five-year period of supervised release with conditions to include the agreed-upon suspicionless search conditions, and a special assessment of $200.